# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    v.

CLIFTON SMITH,

      *Defendant.*

Criminal Action No. 18-193 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Clifton Smith's motion to suppress physical evidence raises an unsettled issue of Fourth Amendment law: Whether the smell of phencyclidine ("PCP"), alone, justifies the use of handcuffs during a *Terry* stop. Dkt. 8. The relevant events in this case occurred on March 30, 2018, at approximately 5:24 p.m., when two Metropolitan Police Department ("MPD") officers were patrolling the 1000 block of 14th Street, S.E. The officers observed Defendant standing next to the open driver's-side door of a parked car with tinted windows. At the time, no one was in the driver's seat, but another man was seated in the passenger seat, a woman was standing near the left tail light, and an infant and a toddler were seated in the back seat of the car. Approximately thirty seconds after exiting the patrol car, one officer decided to handcuff Defendant because the officer smelled PCP. The other officer then led Defendant—still handcuffed—to the rear of the car and conducted a pat-down with Defendant's consent. The officer felt a hard, cylindrical object in the crotch of Defendant's jeans, which he suspected to be a vial of PCP. It turned out to be the barrel of a loaded, semi-automatic handgun. The police also recovered a small bag of heroin and $2,110 in cash from Defendant's person.

Based on that evidence and evidence that Defendant had a prior felony conviction, Defendant was charged with one count of unlawful possession of a firearm, in violation of 18

U.S.C. § 922(g)(1), and one count of unlawful possession of a controlled substance, in violation of 21 U.S.C. § 844(a). He moves to suppress all tangible objects seized from him, primarily arguing that the officers unlawfully arrested him when they placed him in handcuffs. For the reasons explained below, the Court will **GRANT** the motion to suppress.

## I. FINDINGS OF FACT

Although the defendant ordinarily carries the burden on a motion to suppress, *see Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978), where, as here, the defendant produces evidence that he was subjected to a warrantless seizure, the burden shifts to the government to justify the officers' actions. *See* 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.2(b) (5th ed. 2018) [hereinafter "*Search & Seizure*"] ("[I]f the police acted without a warrant[,] the burden of proof is on the prosecution."); *see also Florida v. Royer*, 460 U.S. 491, 501 (1983) (plurality opinion) ("It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion . . . satisf[ied] the conditions of an investigative seizure."). Based on the officers' testimony, the parties' briefing and oral argument, and the submitted evidence,[1] the Court makes the following findings of fact:

---

[1] The Court has reviewed Defendant's motion, Dkt. 8, the government's opposition, Dkt. 10, Defendant's reply, Dkt. 13, and both parties' supplemental briefing, Dkt. 17; Dkt. 18; Dkt. 19. The Court held an evidentiary hearing on November 27, 2018, *see* Minute Entry (Nov. 27, 2018), and heard oral argument on November 30, 2018, *see* Minute Entry (Nov. 30, 2018). Officer Owais Akhtar, the MPD officer who placed Defendant in handcuffs, testified at the evidentiary hearing, and footage from his body-worn camera was admitted into evidence as Government's Exhibit 1. Dkt. 14 at 1. Officer Charles Smith, the MPD officer who conducted the pat-down of Defendant, also testified at the evidentiary hearing, and footage from his body-worn camera was introduced into evidence as Government's Exhibit 2. *Id.* The government also entered into evidence a photograph of the firearm recovered from Defendant's person. *Id.* (Gov't Ex. 3). The defense submitted Defendant's pretrial services report (Def. Ex. 1), a drug test report for Defendant, which indicated that he had tested negative on multiple occasions between January 2, 2015 and February 22, 2017 (Def. Ex. 2), and a photograph of the inside of the driver's-side door (Def. Ex. 3)—all of which were admitted into evidence. Dkt. 15 at 1. The parties also jointly

On March 30, 2018, Officers Owais Akhtar and Charles Smith were patrolling the 1000 Block of 14th Street, S.E., in the District of Columbia in an unmarked police vehicle. Dkt. 16 at 5, 17, 85 (Hrg. Tr.). Both were members of the MPD's crime suppression unit, which "go[es] out . . . and see[s] if there's any suspicious activity going on." *Id.* at 134 (Hrg. Tr.). The officers were dressed in full police uniform. *Id.* at 17 (Hrg. Tr.). At the time, Officer Akhtar had four years of experience with the MPD, *id.* at 5 (Hrg. Tr.), and Officer Smith had ten years of experience, *id.* at 83, 85 (Hrg. Tr.). Both officers testified that they were familiar with the area they were patrolling and characterized it as a "high-crime" neighborhood where drugs and guns were prevalent. *Id.* at 6–8, 87 (Hrg. Tr.).

## A.    Stop

At approximately 5:24 p.m., Officers Akhtar and Smith were driving on 14th Street, S.E., when they saw Defendant standing next to a parked white Nissan Altima with dark tinted windows. Dkt. 10 at 1–2. The driver's-side door of the vehicle was open, and Defendant was standing between the door and the inside of the car, with his back to the officers. Gov't Ex. 1 (OA 21:25:44). The officers exited their patrol car to conduct "a traffic stop" due to the tint.[2]

---

entered into evidence the transcript from Defendant's detention hearing on April 3, 2018 (Joint Ex. 1), the transcript from the grand jury hearing before the D.C. Superior Court on April 18, 2018 (Joint Ex. 2), the transcript from the federal grand jury hearing on June 21, 2018 (Joint Ex. 3), and the *Gerstein* Affidavit from the incident, Dkt. 19-1. Finally, the Court admitted into evidence the body-worn camera footage of Sergeant Michael Architzel, an officer who arrived on the scene with the transport team. *See* Minute Order (Jan. 30, 2019). The last of the briefing and evidence was filed on January 7, 2019. Dkt. 19-1.

[2] Officer Akhtar testified that vehicles with Virginia tags, like the one at issue, "should have 50 percent on the front and 35 percent on the back," meaning that the front windows should allow at least 50 percent of light to pass through, and the back windows should allow at least 35 percent of light to pass through. Dkt. 16 at 19 (Hrg. Tr.). Later, when Officer Akhtar tested the tint of the windows using a tint meter, he discovered that the car "had 21 percent on the front driver's side window," *id.* at 20 (Hrg. Tr.), and he issued the owner a warning citation, *see* Gov't Ex. 1 (OA 21:39:21–21:40:08).

Dkt. 16 at 18 (Hrg. Tr.).  At that point, Officer Akhtar's body-worn camera footage shows that Defendant was looking into—but not leaning into or reaching into—the car.  Gov't Ex. 1 (OA 21:25:49–50).  As Officer Akhtar approached the vehicle, a woman (later identified as the car's owner) was standing near the left tail light, and a man was sitting in the passenger seat.  *Id.* (OA 21:25:48–21:26:01).  Unbeknownst to the officers at that time, an infant and a toddler were in the back seat.

Officer Akhtar walked towards Defendant, and Officer Smith approached the passenger-side of the vehicle.  As he approached Defendant, Officer Akhtar called out, "What's going on, boss?"  *Id.* (OA 21:25:48).  Defendant turned to look at him and then leaned into the car to converse with the passenger, who had asked, "What's going on?"  *Id.* (OA 21:25:51–54).  Officer Akhtar responded, "Tint."  *Id.* (OA 21:25:54).  Defendant then said, "Huh?"  *Id.* (OA 21:25:55).  By then, Officer Akhtar was standing directly behind Defendant, within arm's reach, and said, "Illegal tint, that's what's up."  *Id.* (OA 21:25:56).  Defendant turned away from the driver's-side door, at which point Officer Akhtar grabbed his arm.  *Id.* (OA 21:25:59).  Defendant immediately protested, "I ain't going nowhere."  *Id.*  Officer Akhtar warned, "Don't do anything stupid" and turned Defendant around so that the front of Defendant's body was against the car.  *Id.* (OA 21:26:00–03).  Officer Akhtar began to squeeze Defendant's back over his jacket and asked, "You ain't got no PCP on you, right?"  *Id.* (OA 21:26:04).  Defendant indicated that he did not, as Officer Akhtar moved Defendant's arms behind his back.  *Id.* (OA 21:26:07–09).  Officer Akhtar then asked Officer Smith to "pass [him] the handcuffs."  *Id.* (OA 21:26:12).  He again asked Defendant if he had PCP, to which Defendant again indicated that he did not.  *Id.* (OA 21:26:19).

Meanwhile, Officer Smith was standing at the passenger side of the vehicle. The passenger-side door was closed and the window was open a sliver when Officer Smith first approached. Gov't Ex. 2 (CS 21:25:56). As he walked up to the car, Officer Smith said, "You're still in public space." *Id.* (CS 21:26:06). The passenger then rolled down his window, *id.* (CS 21:26:09), and Officer Smith repeated that the car was in a public space, *id.* (CS 21:26:11). The passenger informed Officer Smith that his son was in the back seat and asked for permission to reach for his child. *Id.* (CS 21:26:13–15). At that point, Officer Smith responded to Officer Akhtar's request for handcuffs and walked around the front of the car to where Officer Akhtar and Defendant were standing. *Id.* (CS 21:26:16). When Officer Smith arrived with the handcuffs, he helped secure Defendant. *Id.* (CS 21:26:25–31). Approximately thirty seconds elapsed between the time the officers exited their vehicle and when Officer Akhtar maneuvered Defendant's arms into position to be handcuffed. *See* Gov't Ex. 1 (OA 21:25:48–21:26:12).

1. *PCP Odor*

Both Officer Akhtar and Officer Smith testified that they smelled PCP when they encountered Defendant. Officer Akhtar stated that he is well-acquainted with the smell from his training and from the "numerous arrests" he has made "which involved PCP." Dkt. 16 at 8 (Hrg. Tr.). He described PCP as having a "very strong, distinct . . . chemical odor," which can be "smell[ed] . . . from far away" and which "lasts for a long time." *Id.* at 8, 10 (Hrg. Tr.). He testified that the smell from an open vial of PCP is strong enough to fill "the whole entire courtroom." *Id.* at 11 (Hrg. Tr.). Officer Smith corroborated this testimony. *See id.* at 91–92 (Hrg. Tr.). He further explained that PCP is usually kept in a glass vial and that individual users often dip cigarettes "into the liquid and then . . . smoke the cigarette." *Id.* at 92 (Hrg. Tr.).

The officers' testimony about *the source* of the PCP odor, however, varied over time. Shortly after Defendant's arrest, Officer Smith signed two statements. In the first, he attested that "[a]n odor consistent with PCP emanated from Defendant['s] . . . person." Dkt. 19-1 at 2. In the second, he added that "there was an empty glass vial in the driver's side car door." *Id*. at 4. A few days later, at the preliminary hearing in Superior Court, where the case was originally charged, Officer Akhtar also testified that, as he "approached" Defendant, he "could smell an odor consistent with PCP emanating from [Defendant's] person" and that "an empty vial" was located "in the car's door," specifically, the "driver door." Joint Ex. 1 at 5. When Officer Smith subsequently appeared before the grand jury in Superior Court, however, he no longer asserted that the smell "emanated" from Defendant. Instead, he testified that "[i]t was coming from the vehicle," Joint Ex. 2 at 5, and, when asked if he was "ever able to locate the source of the odor," he stated: "In the driver's side door in the handle there was a vial of PCP but it had been empty, but it was—you could tell that there had been PCP in it from the odor," *id.* at 7. Officer Smith later acknowledged at the suppression hearing that his grand jury testimony was based on what Officer Akhtar told him "after the arrest." Dkt. 16 at 149 (Hrg. Tr.). Two months later, Officer Smith appeared before the federal grand jury and again amended his testimony. Asked about the source of the PCP odor, he stated: "When we came to the area, when my partner, Officer Akhtar was with [Defendant], he wasn't sure if it was the vehicle or [Defendant], but it was in the area where [Defendant] was standing." Joint Ex. 3 at 4. Officer Smith confirmed that he also smelled PCP, but he was not asked about his perception of the source of the smell. *Id.*

The officers' testimony at the suppression hearing was similarly equivocal. Officer Akhtar initially testified that he placed Defendant in handcuffs because he smelled "a strong odor of PCP coming off [Defendant's] person." Dkt. 16 at 21 (Hrg. Tr.). On further inquiry,

however, he was less confident about this, asserting that "[a]t the time," he "thought it was coming off of" Defendant but that he "was too close to the car" and Defendant to know. *Id.* Later, on cross-examination, Officer Akhtar retreated further, testifying that "[he] couldn't really tell exactly if the source [of the PCP odor] was just [Defendant] or the car or both," *id.* at 33 (Hrg. Tr.); in other words, he "couldn't pinpoint" the smell, *id.* at 50 (Hrg. Tr.). He further acknowledged that, even after Defendant had been moved away from the car door, he continued to smell PCP "in the general area." *Id.* at 32 (Hrg. Tr.).

Officer Smith testified at the suppression hearing that he, too, smelled PCP before placing Defendant in handcuffs. He stated that he first detected a "faint smell" of PCP when he approached the passenger side of the vehicle, where the door was closed, but the window was briefly rolled-down. *Id.* at 98 (Hrg. Tr.). At that point, however, he "couldn't really distinguish where [the odor] was coming from." *Id.* It was not until he moved to Officer Akhtar's side— where the driver's-side door was open—that the odor grew "much stronger . . . as if it was in that area." *Id.* at 99 (Hrg. Tr.). Nevertheless, Officer Smith also conceded that "[he] couldn't tell where exactly" the PCP odor was emanating from, only that "it was in that vicinity." *Id.* Given the strength of the smell, however, he testified that the odor was "very recent in time" and was not a lingering odor from someone who had smoked PCP in the area an hour or two before. *Id.* at 165 (Hrg. Tr.).

Based on the officers' testimony and other evidence, the Court finds that the officers smelled—or reasonably believed that they smelled—PCP in the area where Defendant was standing when they handcuffed him. Given that both officers consistently testified that they smelled PCP, and, given that Officer Akhtar asked Defendant if he had any PCP *before* handcuffing him, it is unlikely that the officers fabricated the odor, as Defendant alleges, to

justify their decision to place Defendant in handcuffs. The fact that no PCP was ultimately recovered from the scene, moreover, does not render the officers' sworn testimony implausible. The evidence shows that PCP has a strong and distinct smell, and, although Officer Smith testified that he believed the odor was recent, that does not foreclose the possibility that someone possessed PCP in the area shortly before the officers arrived. Finally, as discussed below, Officer Smith subsequently mistook the end of gun barrel for a vial of PCP hidden in Defendant's pants; his mistake is indicative of a mindset that he was likely to find PCP. The Court, accordingly, credits the officers' testimony that they smelled PCP.

The Court cannot conclude, however, that the officers smelled PCP emanating from Defendant. Given that neither officer could pinpoint the source of the odor to Defendant, the Court finds that the government has failed to carry its burden of demonstrating that Defendant smelled of PCP; the evidence only shows that the officers smelled PCP in the vicinity of the driver's side of the car.

### 2. *Officer Safety*

Officer Akhtar further testified that, upon smelling PCP, he placed Defendant in handcuffs, as was his practice. Dkt. 16 at 12–13 (Hrg. Tr.). Although the MPD does not have a policy and does not offer training "with respect to whether as a matter of course" people suspected of being under the influence of PCP should be handcuffed, *id.* at 75–76 (Hrg. Tr.), Officer Akhtar stated that "[t]he first thing [he] personally do[es]" upon encountering individuals who "may or may not be under the influence of PCP" is to "secure them in handcuffs" so that "they won't be able to fight," *id.* at 12–13 (Hrg. Tr.). He explained that, based on his experience, "most of the time," individuals on PCP "turn violent." *Id.* at 74 (Hrg. Tr.). He described their behavior, as follows:

> They [are] very unpredictable.  They can turn violent in a second.  They'll be calm for one second and then they'll turn violent in the next second, start taking their clothes off, start fighting.  They'll have extra strength for some reason. . . .  They become more powerful and they don't feel pain.

*Id.* at 12 (Hrg. Tr.).  Officer Akhtar further explained that the only time he failed to secure someone (in the more than ten times that he had encountered a person under the influence of PCP), the situation turned violent:

> My first encounter where I did not handcuff them, it turned violent and took five of us to put him in handcuffs.  And besides that, when we're transporting an individual under the influence, because they were already handcuffed, they will just kick and spit.

*Id.* at 75 (Hrg. Tr.).  Officer Akhtar testified that, even though it is not a department-wide practice to place individuals suspected of being under the influence of PCP in handcuffs, he "always" does so, and the "people that [he] work[s] closely with . . . do the same."  *Id.* at 76 (Hrg. Tr.).

Officer Smith corroborated Officer Akhtar's testimony that individuals on PCP can become violent.  He stated that, "most of the times when [he] deal[s] with PCP, it's usually a dangerous situation."  *Id.* at 89 (Hrg. Tr.).  He further testified that he is particularly concerned about such individuals "losing their temper and getting angry, wanting to fight," because "a lot of times on PCP, the strength is out of this world[,] . . . [it's] really hard to control."  *Id.*  Like Officer Akhtar, Officer Smith testified that, if he can tell that an individual is on PCP, "and [he] can place them in handcuffs before they get angry, then [he] will do that."  *Id.* at 90 (Hrg. Tr.).  He estimated that he has done so "more than 20" times throughout his career.  *Id.* (Hrg. Tr.).  He also testified that "the majority of officers [he] know[s] would do the same."  *Id.* at 91 (Hrg. Tr.).

Both officers also testified that individuals under the influence of PCP exhibit telltale signs.  According to Officer Smith, "people . . . exhibit it in different ways," *id.* at 89 (Hrg. Tr.):

Some of them will be excited and violent. Some of them will be passed out on the floor that you can't even wake up. So you'll get different things with different people. But typically, a lot of times we see people that have like almost superhuman strength when they're on PCP, and they're a little bit more irate and angry.

*Id.* (Hrg. Tr.). Officer Akhtar agreed that there are cues that indicate someone is on PCP:

Sweating, and we like to call it the huh stage. When you ask them any question, their response will be, "Huh? Huh?" And their eyes, they just give you a blank stare.

*Id.* at 74–75 (Hrg. Tr.).

Neither officer, however, testified that Defendant exhibited any of these characteristics before they placed him in handcuffs. Officer Akhtar acknowledged that Defendant was not violent; he did not make any furtive or suspicious movements; he did not exhibit any kind of superhuman strength; he never made any aggressive movements or statements; and he did not try to flee. *Id.* at 44–46 (Hrg. Tr.). Both officers' body-worn camera footage confirms that Defendant was calm, responsive, and compliant before he was handcuffed. The officers also did not point to any other evidence that Defendant was dangerous. To the contrary, Officer Akhtar testified that he "had no reason to believe" Defendant was armed. *Id.* at 45 (Hrg. Tr.).

The Court credits the officers' testimony that individuals on PCP often pose a danger to officer safety. The Court finds, however, that, at the time Defendant was placed in handcuffs, there were no indicia he was on PCP, armed, or otherwise dangerous.

    3.    *Vial*

The government also contends that, at the time Officer Akhtar placed Defendant in handcuffs, "[he] could see in plain view an empty glass vial in the driver's-side car door, which was consistent with the sort of vial used for holding liquid PCP." Dkt. 10 at 3. Defense counsel argues that this is "implausible." Dkt. 13 at 7. For purposes of resolving this motion, the Court

need determine only whether the government has carried its burden of proving that the officers saw—or reasonably believed that they saw—a vial of PCP in the driver's-side door before Officer Akhtar handcuffed Defendant. The Court concludes that it has not.

Although Officer Akhtar suggested at the preliminary hearing in Superior Court that he saw "an empty vial in the car's door" as he "approached" Defendant, Joint Ex. 1 at 5, neither officer testified at the suppression hearing that he saw the vial *prior* to handcuffing Defendant. Officer Akhtar first stated that he saw the vial *after* he handcuffed Defendant:

> A. [O]nce he was secured in handcuffs, I passed him over to Officer Smith.
> Q. And what happened then at that point?
> A. And after that I came back to the car to see who else was in the car.
> Q. And when you saw—looked into the car, what did you see?
> A. There was an empty vial, a glass vial, on the door handle.

Dkt. 16 at 23–24 (Hrg. Tr.). He later testified that he was unsure of the timing:

> Q. [D]o you know as you sit here today when exactly in this sequence you saw this vial?
> A. I believe when I went back to the vehicle.
> Q. You believe it was when you went back to the vehicle?
> A. I'm not sure if I saw it as soon as I started talking to Mr. Smith or when I went back to the vehicle, but at some point I did see it.

*Id.* at 24 (Hrg. Tr.).

Officer Smith's testimony is even more equivocal. He testified that he could not say for certain whether he saw the vial:

> Q. [D]id you see this yourself?
> A. I could see it, but I can't say – I never handled it. I never took it from where it was. But at that point, I was just concerned with really the individual we were securing.
> Q. So do you have a memory of seeing a vial?
> A. I have a memory of it, but I can't say for sure.
> Q. Okay. What do you mean by that?
> A: I just know through my communication with Officer Akhtar. I want to say I remember it, but I can't say 100 percent whether I saw it or not. But I was speaking with Officer Akhtar and he insinuated, and which I could also smell the PCP while we were securing the individual.

*Id.* at 99 (Hrg. Tr.). When pressed, he stated that "[he] was able to tell that there was a vial in the door handle of the vehicle" because of "a nonverbal communication" from Officer Akhtar. *Id.* No such "nonverbal communication," however, was captured by the officers' body-worn camera footage, nor did Officer Smith explain what he meant by a "nonverbal communication." The officers' testimony and other evidence, accordingly, falls far short of establishing that either officer saw a glass vial during the short period of time from when Officer Akhtar first approached Defendant to when he decided to place him in handcuffs.

Beyond the question of timing, the Court finds that the government has failed to carry its burden of showing that either officer ever saw the vial. No vial (or any PCP or related paraphernalia) was recovered from the scene. *See id.* at 31 (Hrg. Tr.). Moreover, despite Officer Akhtar's testimony that he "picked up [the] vial," "took a look at it," and "smelled it," *id* at 51 (Hrg. Tr.), neither officer's body-worn camera footage shows the vial or a motion by Officer Akhtar consistent with examining or smelling a vial. Officer Akhtar explained that "it's possible that when [he] looked at it, it was on the side and . . . therefore [the camera] didn't capture the incident." *Id.* at 62 (Hrg. Tr.). In light of that testimony, the Court asked Officer Akhtar to identify on the video when this might have occurred, and Officer Akhtar identified five moments when he was standing near the driver's-side door, and it was *possible* that he examined the vial without his actions appearing on the video. *Id.* at 68–72 (Hrg. Tr.) (citing OA 21:26:58, OA 21:23:24, OA 21:26:57, OA 21:33:27, OA 21:34:57). The Court has carefully reviewed all five moments and cannot discern any movements consistent with picking up a vial. In addition, although the officers converse throughout the video, the video contains no mention of a vial.

Two other pieces of evidence cast further doubt on Officer Akhtar's recollection that he picked up and examined the vial. First, Officer Akhtar acknowledged on cross-examination that

he had been trained to "put gloves on both hands" when handling PCP or "something that [he] think[s] has PCP in it." *Id.* at 78 (Hrg. Tr.). Yet, his body-worn camera footage shows that he never put on gloves. Officer Akhtar did not explain this discrepancy, nor did he testify that gloves were unavailable. In contrast, Officer Smith and Sergeant Architzel's body-worn camera footage shows that, before performing the search incident to Defendant's arrest, the officers put on gloves. *See* Gov't Ex. 2 (CS 21:35:21) (Officer Smith); BWC (MA 21:37:29–33) (Sergeant Architzel). Second, although Officer Akhtar suggests that his movements may not have been captured by his body-worn camera, on other occasions, his footage shows similar motions: it shows, for example, him bringing his walkie-talking to his mouth, and it shows him examining a driver's license—movements similar to picking up, examining, and smelling a vial. *See, e.g.*, Gov't Ex. 1 (OA 21:27:03, OA 21:28:48).

Finally, the government acknowledges that the officers did not photograph, collect, or preserve a vial from the scene. Although Officer Akhtar testified that he smelled the vial and concluded that it did not contain PCP, and stated that he was "distracted" by his subsequent investigation into the passenger, Dkt. 16 at 40 (Hrg. Tr.), that does not fully explain why no effort was made to preserve—or at least to document—potentially inculpatory evidence.

The Court cannot say with certainty what occurred, but, in light of the evidence discussed above, the Court finds that the government has failed to carry its burden of establishing that either officer saw a glass vial in the car before—or even after—Defendant was placed in handcuffs.

## B. Pat-Down

After Defendant was handcuffed, Officer Smith walked him to the back of the car. He explained to Defendant that he was being moved because "there's two kids in the back seat" and

"[he] didn't want them to be scared." Gov't Ex. 2 (CS 21:26:52–21:27:02). Officer Smith reassured Defendant that "everything's fine," and that "[he was] being detained." *Id.* (CS 21:27:02–08). After a brief discussion, Officer Smith asked, "You got no weapons on you, right?" *Id.* (CS 21:27:27). Defendant responded, "No." *Id.* Officer Smith followed up with, "Do you mind if I pat you down now?" *Id.* (CS 21:27:28). Defendant answered, "Go ahead." *Id.* (CS 21:27:30).

Both officers testified that, at the time of the pat-down, they had no reason to believe that Defendant was armed. *See* Dkt. 16 at 45 (Hrg. Tr.) (Akhtar) (admitting that "[he] had no reason to believe [Defendant] was armed"); *id.* at 103 (Hr. Tr.) (Smith) (admitting that "up to that point" he did not have "any indications . . . of any weapons"). Officer Smith explained, however, that as a matter or practice, he always asks for consent to conduct a pat-down for weapons:

> That's just a practice that I have. If they consent, then I'll pat them down. If not, then that's fine as well. But I usually for my own safety and peace of mind always ask if I can pat-down for weapons just to be more calm and—not necessarily calm, but more peace of mind in reference to our interactions.

*Id.* at 103 (Hrg. Tr.).

Officer Smith began to pat down Defendant—who stood with his back to the officer—by frisking "the waistband upper area, the front and back" of Defendant's windbreaker. *Id.* at 106 (Hrg. Tr.). He then continued to pat down Defendant's lower body. He first frisked Defendant's left leg, moving from the front pant pocket down to the ankle, and then frisked the right leg, moving from the ankle upward. Dkt. 16 at 110–11 (Hrg. Tr.). Officer Smith testified that, as he was "moving up the right leg," he felt "an object that is not consistent with the male anatomy" in the "inner thigh area." *Id.* at 111 (Hrg. Tr.); *see also* Gov't Ex. 2 (CS 21:27:50). In his experience, that area is a popular place to hide contraband. *See* Dkt. 16 at 114 (Hrg. Tr.).

Officer Smith's body-worn camera footage shows that he then proceeded to grasp the crotch point of Defendant's jeans, *see* Gov't Ex. 2 (CS 21:27:51), press the area between Defendant's back pant pockets with his outstretched fingers once, *id.* (CS 21:27:53), and squeeze that same area once, pushing inward with his thumb, *id.* (CS 21:27:54). The entire sequence lasted less than five seconds. Once Officer Smith determined that the object was "hard" and "[c]ylindrical," Dkt. 16 at 111 (Hrg. Tr.), he believed that he had located the vial that was "the source of the PCP odor," *id.* at 111–12 (Hrg. Tr.).[3] He immediately asked Officer Akhtar to "call transport," *id.* at 117 (Hrg. Tr.), which signaled that they "had an arrest at that time," *id.*

Defendant claims that Officer Smith "grop[ed] his groin area and attempt[ed] to digitally penetrate his anus through his clothing." Dkt. 8 at 2. In support of this claim, he argues that Officer Smith would not have "said four times things were up his butt" on the body-worn camera footage, Dkt. 16 at 143 (Hrg. Tr.), including statements such as, "You have a vial of PCP in your crack," *id.* at 144 (Hrg. Tr.), if he did not conduct a cavity search. Defendant also emphasized that, when "[Officer Smith] started to put [his] hands . . . into [his] private areas," he can be heard protesting, "What are you doing?" *Id.* at 142 (Hrg. Tr.); *see also* Gov't Ex. 2 (CS 21:27:53).

Officer Smith disputes this characterization. He testified that, when he felt the gun, his hand was near Defendant's "[u]pper thigh in between his legs." Dkt. 16 at 116 (Hrg. Tr.). Moreover, he insisted that, although his hands were pressing against *the object* in Defendant's pants, they did not touch Defendant's groin or interior region. *Id.* Officer Smith explained that, although he appeared to be "holding" Defendant on his body-worn camera footage, *id.* at 109

---

[3] What he actually felt was the "barrel of the weapon," *id.* at 128 (Hrg. Tr.), which was located between Defendant's legs and facing "towards the back of his person," with the handle pointing towards Defendant's chest, *id.* at 133 (Hrg. Tr.).

(Hrg. Tr.), he, in fact, was not touching Defendant's body because there were "probably a good couple of inches" of space between "the crotch [point] of [Defendant's] jeans all the way up to [Defendant's] actual crotch, genitalia area," *id.* at 115 (Hrg. Tr.). He further testified that Defendant was wearing "skinny jeans," which did not "come up above his buttocks," *id.* at 109 (Hrg. Tr.), and three layers of tight clothing underneath his pants: "boxer briefs," "compression pants," and "compression shorts," *id.* at 108 (Hrg. Tr.).

Based on Officer Smith's testimony and his body-worn camera footage, the Court finds that Officer Smith did not digitally penetrate Defendant's anus or grope his buttocks or genitalia through his clothing. The Court credits Officer Smith's testimony that his hands were not on Defendant's buttocks and that, when he referred to the vial being in Defendant's "butt," he did not "literally mean inside [Defendant's] anus." *Id.* at 118 (Hrg. Tr.). Officer Smith's body-worn camera footage confirms that Defendant's jeans were baggy in the crotch area and that the jeans were sitting several inches below Defendant's waist, revealing his compression layer underneath. Gov't Ex. 2 (CS 21:27:43). Coupled with the fact that Defendant was wearing three layers underneath his jeans, the Court finds that Officer Smith could not have conducted a cavity search. Finally, the Court finds that the Officer Smith's brief cupping, pressing, and squeezing motions are consistent with feeling the shape of the gun inside Defendant's pants, and not with groping Defendant's groin area.

## C.    Search

Shortly after calling for transport, additional officers arrived on the scene. They began to conduct a "full search" of Defendant incident to arrest. Dkt. 16 at 124 (Hrg. Tr.). Officer Smith located "a large amount of money in [Defendant's] left pants pocket," and "a single zip of a tan powdered substance" in Defendant's coin pocket that field-tested positive for heroin. *Id.*; *see*

*also* Gov't Ex. 2 (CS 21:36:13–40).  When Officer Smith "checked [Defendant's] leg again," he "fel[t] the handle" of the gun.  Dkt. 16 at 124 (Hrg. Tr.).  At that point, he realized that what he "thought was a vial," was, in fact, "a firearm."  *Id.*  He removed a loaded purple, Ruger handgun from Defendant's pants.  *Id.* at 129 (Hrg. Tr.); *see also* Gov't Ex. 3.  Based on that evidence and Defendant's prior felony conviction, Defendant was indicted on one count of unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and one count of unlawful possession of a controlled substance, in violation of 21 U.S.C. § 844(a).  Dkt. 1.  The officers did not recover any PCP or PCP paraphernalia.

## II.  CONCLUSIONS OF LAW

Defendant Smith claims that the physical evidence recovered from his person was seized as a result of his unlawful arrest.  Dkt. 13 at 2.  "When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure."  *United States v. Sheffield*, 799 F. Supp. 2d 22, 28 (D.D.C. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).  Generally, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  *Rakas*, 439 U.S. at 130 n.1.  When "a defendant produces evidence that he was arrested or subjected to a search without a warrant," however, "the burden shifts to the government to justify the warrantless arrest or search."  *United States v. Jones*, 142 F. Supp. 3d 49, 56 (D.D.C. 2015) (internal citations omitted).  Here, Defendant contends, *inter alia*, that he was unlawfully arrested when the officer placed him in handcuffs at the outset of their encounter.  Dkt. 13 at 3.  Accordingly, the "government [bears] the burden of showing that the measures employed during the stop were justified."  *United States v. Mangum*, 100 F.3d 164, 169 (D.C. Cir. 1996).

The motion to suppress raises three issues. First, Defendant argues that the officers lacked reasonable suspicion to stop him. Second, he contends that the officers' use of handcuffs transformed the stop into an impermissible arrest. And third, he argues that Officer Smith's pat-down exceeded the scope of a *Terry* frisk. The Court will address each in turn.

## A.     Reasonable Suspicion to Stop

As a threshold matter, Defendant contends that the officers "lacked reasonable suspicion" to conduct "[a]n investigatory stop." Dkt. 13 at 9. He argues that "none of the information the officers had at the time they seized [him] provided a basis to suspect him of criminal activity." *Id.* The Court is unpersuaded.

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that "the police can stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion . . . that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). Reasonable suspicion exists if the officer can articulate a "particularized" basis—as opposed to an "inchoate . . . suspicion or 'hunch'"—for "suspecting the particular person stopped of criminal activity." *Terry*, 392 U.S. at 27; *United States v. Abdus-Price*, 518 F.3d 926, 929 (D.C. Cir. 2008) (citations omitted). Unlike probable cause, reasonable suspicion requires only a "minimal level of objective justification for the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (noting that the standard for reasonable suspicion is "significantly lower" than that of probable cause).

When assessing whether an officer had reasonable suspicion to effectuate a *Terry* stop, the Court must give "due weight" to "the specific reasonable inferences" the officer drew "in light of his experience," *Terry*, 392 U.S. at 27, and must consider "the totality of the

circumstances," *Sokolow*, 490 U.S. at 8 (citation omitted). The D.C. Circuit has also emphasized that, "even though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors—especially when viewed through the eyes of an experienced officer—may." *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001).

Applying this standard, the Court concludes that Officers Akhtar and Smith had sufficient justification to "stop and briefly detain" Defendant "for investigatory purposes." *Sokolow*, 490 U.S. at 7. Both officers testified, and their body-worn camera footage confirms, that Defendant was standing between the door and driver's seat of a car with heavily tinted windows when they approached. Dkt. 10 at 2–3. In Officer Akhtar's experience, "dark tinted windows on a car can be utilized in furtherance of drug trafficking by providing a means of avoiding detection and observation from law enforcement." *Id.* at 2 n.3. Both officers further testified that the neighborhood was a "high-crime" area where drugs and guns were prevalent. Dkt. 16 at 6–8, 87 (Hrg. Tr.). And both testified that, as they got closer to Defendant, they smelled a distinct odor of PCP. *Id.* at 21, 32–33, 98 (Hrg. Tr.). Taken together, these observations are more than sufficient to support a reasonable suspicion that "[D]efendant was in actual or constructive possession of PCP." Dkt. 10 at 8. Indeed, the Supreme Court and D.C. Circuit have upheld investigatory stops based on similar—if not less probative—observations. *See, e.g.*, *Wardlow*, 528 U.S. at 124 (flight in high-crime area gives rise to reasonable suspicion); *Edmonds*, 240 F.3d at 60 ("furtive gestures" at known drug-trafficking site plus companion's flight give rise to reasonable suspicion).

The Court will, accordingly, go on to consider whether handcuffing Defendant transformed the otherwise valid *Terry* stop into an arrest and, if so, whether there was probable cause to arrest.

## B.     Use of Handcuffs

The parties agree that that the use of handcuffs during a *Terry* stop does not "automatically convert [the stop] into an arrest." Dkt. 18 at 25; *see also* Dkt. 13 at 3. They disagree, however, whether Officer Akhtar's decision to handcuff Defendant thirty seconds after exiting the patrol car exceeded the bounds of an investigative detention. *See United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) ("[T]he amount of force used to carry out the stop . . . must be reasonable, but may include using handcuffs . . . ." (quoting *United States v. Laing*, 889 F. 2d 281, 285 (D.C. Cir. 1989))). The government argues that handcuffing Defendant did not transform the stop into an arrest because the officers were reasonably concerned for their "safety given the dangers inherent with PCP," Dkt. 10 at 8; and, in the alternative, that the officers had probable cause to arrest Defendant, *see* Dkt. 18 at 21–32. For the reasons explained below, the Court is unpersuaded.

### 1.     *Whether the Use of Handcuffs Converted the Stop into an Arrest*

It is well-settled that "the right to make . . . [an] investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "In deciding what degree of force is permissible, courts must look to 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Dykes*, 406 F.3d at 720 (quoting *Graham*, 490 U.S. at 396). Consistent with the language of the Fourth Amendment, the

test is, ultimately, "one of reasonableness." *Id.*; *accord* U.S. Const. amend. IV (proscribing

"unreasonable searches and seizures"); *Florida v. Royer*, 460 U.S. at 514–15 (plurality opinion)

(balancing "the amount of intrusion upon individual privacy against the special law enforcement

interests" of permitting an investigative detention "on less than probable cause"). A *Terry* stop

must (1) "last no longer than is necessary to effectuate the purpose of a stop" and (2) employ

"the least intrusive means reasonably available to verify or dispel the officer's suspicion."

*Florida v. Royer*, 460 U.S. at 500 (plurality opinion). "[A] stop that is unduly prolonged or

intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall v.

District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017).

 Although "handcuffing . . . [a] suspect is not ordinarily proper" during an investigative

stop, there are "a variety of special circumstances that will make such a step permissible."

*Search & Seizure* § 9.2(d) (collecting cases); *see also United States v. Taylor*, 716 F.2d 701, 709

(9th Cir. 1983) (noting that, although the use of handcuffs "substantially aggravat[es] the

intrusiveness of an investigatory stop," doing so does "not necessarily convert a *Terry* stop into

an arrest necessitating probable cause"). Officers can, for example, use handcuffs without

escalating the stop into a full-blown arrest when they reasonably fear for their safety or the safety

of others. *See Dykes*, 406 F.3d at 720 (upholding the use of handcuffs where the officers

"reasonabl[y] . . . fear[ed] that [the suspect] had a weapon in his waistband"); *see also United

States v. Tilmon*, 19 F.3d 1221, 1227–28 (7th Cir. 1994) (upholding use of handcuffs during an

investigative detention where the suspect matched the description of an armed bank robber).

Courts have also upheld the use of handcuffs when necessary to allow the police to complete

their investigation, including where the suspect "attempted to resist police, made furtive gestures,

ignored police commands, attempted to flee, or otherwise frustrated police inquiry." *Womack v.*

*United States*, 673 A.2d 603, 609 (D.C. 1996) (collecting cases); *see also United States v. Wilson*, 2 F.3d 226, 232 (6th Cir. 1993) (suspect "fled" and "was certainly very actively evading [the police]"); *Taylor*, 716 F.2d at 709 (suspect posed "possibility of an assault or attempt to flee"); *United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir. 1976) (suspect was uncooperative).

In this case, the government has not offered any evidence, and does not argue, that Defendant was uncooperative or that he posed a flight risk. Instead, its sole justification for the use of handcuffs is that "Officer Akhtar believed that cuffing [Defendant] was necessary for officer safety" because "individuals under PCP's influence can be quite dangerous." Dkt. 10 at 4. For purposes of the Fourth Amendment, "[t]he critical question is whether a reasonably prudent officer would have been justified in using handcuffs . . . ." *Womack*, 673 A.2d at 609. That objective standard requires the Court to determine whether "the facts and circumstances of [this] particular case" would lead a reasonable officer to conclude that Defendant "pose[d] an immediate threat to the safety of the officers or others." *Dykes*, 406 F.3d at 720 (quoting *Graham*, 490 U.S. at 396).

Although a close question, the Court is unconvinced that a reasonable officer would have believed that Defendant posed an immediate threat to officer safety. Officer Akhtar explained that he handcuffed Defendant because that is "always" the "first thing [he] personally do[es]" upon encountering an individual who "may or may not be on PCP." Dkt. 16 at 12 (Hrg. Tr.). Given the officers' testimony about the effects of PCP, the Court does not doubt that a reasonable officer would fear for his safety or the safety of others in an encounter with an individual high on PCP. The question here, however, is not whether it is reasonable to handcuff a suspect who was high on PCP, but whether it was reasonable—in light of the totality of

circumstances—to believe that Defendant was on PCP. For several reasons, the Court concludes that it was not.

To start, neither Officer Akhtar nor Officer Smith testified that he believed Defendant was high on PCP. Rather, Officer Akhtar testified that it was his general practice to handcuff individuals who "may or may not be on PCP." *Id.* at 12 (Hrg. Tr.). Moreover, as explained in the findings of fact, the evidence does not establish that either officer smelled PCP on Defendant's person; rather, the evidence merely shows that they smelled PCP in Defendant's vicinity. Given the officers' testimony that it was not uncommon to smell PCP in the area where they encountered Defendant, *id.* at 165 (Hrg. Tr.), and that the smell of PCP is overpowering and can linger, *id.* at 8, 10 (Hrg. Tr.), the smell of PCP near Defendant, alone, does not permit the reasonable inference that he had ingested the drug.

Nor has the government offered any other evidence that Defendant had recently smoked PCP. To the contrary, both officers' testimony and their actions at the scene suggest that they believed the source of the odor was a vial of liquid PCP—not PCP that Defendant had ingested. Upon approaching Defendant, Officer Akhtar asked, "You ain't got no PCP on you, right?" He did not ask, "You're not on PCP, are you?" *See* Gov't Ex. 1 (OA 21:26:05–07). Officer Akhtar also allegedly told Officer Smith after Defendant's arrest that the source of the odor was a vial of PCP in the driver's side car door. Dkt. 16 at 148–49 (Hrg. Tr.). Officer Smith's testimony indicates that he, too, believed what he had smelled was a vial of liquid PCP. For instance, he testified that, when he felt the barrel of the gun during the pat-down, he believed that he had located the vial that was "the source of the PCP odor." *Id.* at 111–12 (Hrg. Tr.) (emphasis added).

Most significantly, Defendant exhibited none of the signs of being under the influence of PCP. Both officers testified that individuals on PCP exhibit symptoms such as sweating, giving blank stares, exhibiting superhuman strength, acting belligerent, and acting confused or disoriented, such as responding "Huh? Huh?" to questions. *See id.* at 74–75, 89 (Hrg. Tr.). Officer Akhtar testified—and his camera footage confirms—that, at the time he handcuffed Defendant, Defendant exhibited none of those symptoms. *Id.* at 75 (Hrg. Tr.); Gov't Ex. 1 (OA 21:25:48–21:26:12). He did respond, "Huh?" when Officer Akhtar approached, but that was not out of the ordinary given Officer Akhtar's preceding utterance: "Tint." Their subsequent interaction demonstrates that Defendant was cogent. It may be that some individuals under the influence of PCP are asymptomatic before turning violent, but, if so, the government has not made that argument, nor has it provided any testimony or evidence in support of such a claim. Simply put, there is no evidence—aside from the smell of PCP in Defendant's vicinity—to suggest that Defendant was on PCP.

The Court asked the government to identify any authority that would allow the use of handcuffs under the present circumstances, and, in response, it directed the Court to the Sixth Circuit's decision in *United States v. Foster*, 376 F.3d 577 (6th Cir. 2004). In *Foster*, the police observed the defendant "emerge from a parked vehicle" and walk "towards a dumpster," which, in the officers' experience, was used at times as a place to hide PCP. *Id.* at 581. When the officers approached the defendant, they "could smell PCP coming from [his] person." *Id.* They asked the defendant for identification, but he said that he did not have any. *Id.* The defendant, who was wearing only a t-shirt in the dead of winter in Cleveland, then asked if he could return to his car to stay warm, and the officer agreed to let him do so until they could retrieve their police vehicle, which was "parked several blocks away." *Id.* at 582. But, before

the defendant was allowed to return to his car, one of the officers handcuffed and frisked him. *Id.* On appeal, the defendant argued that, by handcuffing him, the officers effected an arrest without probable cause. *Id.* The Sixth Circuit disagreed, concluding that the officers did not "overstep[] . . . the permissible bounds of the *Terry* doctrine." *Id.* at 587.

*Foster* differs from this case in a number of important aspects. First, unlike in this case, the evidence in *Foster* unequivocally established that the officers smelled PCP "coming from" the defendant. *Id.* at 581–82. Second, the decision to handcuff the defendant was made only after he requested that he be allowed to return to his car, where the officers feared he might have concealed a weapon. *Id*. at 587. Considering that risk and the fact that "people on PCP can become extremely violent," the officers placed the defendant in handcuffs "not only to conduct the pat-down but also to be able to place [him] in his car and out of the cold, without having to worry about the possible weapons in [the defendant's] car that he could reach." *Id.* In contrast, the evidence here shows only that the smell of PCP was coming from the vicinity where Defendant was standing; the officers, by their own account, had no reason to believe that Defendant was armed; and they were not returning Defendant to a place where he might have stored a weapon. Accordingly, *Foster* does little to support the government's position.

The Court recognizes that officers must make difficult and oftentimes split-second decisions in the field. But the Fourth Amendment draws a line between a *Terry* stop and an arrest. In order for the use of handcuffs, which "substantially aggravat[es] the intrusiveness of an investigatory stop," *Taylor*, 716 F.2d at 709, to be reasonable, there must be evidence that would permit a reasonable officer to believe that "the suspect pose[d] an immediate threat to the safety of the officers or others," *Dykes*, 406 F.3d at 720 (quoting *Graham*, 490 U.S. at 396). The fatal defect in the government's argument is the absence of any meaningful evidence that

Defendant was under the influence of PCP.  On top of this, there was nothing about the encounter that might have warranted heightened concern.  To the contrary, the relevant events occurred in broad daylight; an infant and a toddler sat in the back seat of the car; Defendant was calm and non-aggressive; and, importantly, neither officer suspected that he was armed.  In light of these facts, the Court cannot conclude that it was reasonable to handcuff Defendant.

To be clear, the smell of PCP in an area, when combined with evidence that the suspect is on PCP or otherwise dangerous, might well justify the prophylactic use of handcuffs.  But the government has failed to show that this is such a case.  Rather, it asks the Court to approve the use of handcuffs based solely on Defendant's close proximity to a strong odor of PCP in an area that Officer Smith testified smells of PCP "a couple times a week," Dkt. 16 at 165 (Hrg. Tr.).  The Court declines to do so.  The government's position would seem to open the door to routinely handcuffing those who are in close proximity to the smell of PCP without any further justification.  In the Court's view, something more—symptomatic behavior, prior experience with the suspect, a unique risk factor, or the like—is necessary before taking the significant step of using handcuffs in the course of a *Terry* stop.

The Court, accordingly, finds that the use of handcuffs here was "unduly . . . intrusive," thereby transforming "the investigative stop into an arrest requiring probable cause."  *Hall*, 867 F.3d at 153.

2.     *Whether There Was Probable Cause to Arrest Defendant*

The government posited for the first time at oral argument that, in the alternative, Officer Akhtar had probable cause to arrest Defendant.[4]  *See* Oral Arg. Tr. (Rough at 10:13).  As a

---

[4]  The government originally argued in its briefing that "the officers would have been justified in conducting a search of [Defendant] at that point."  Dkt. 10 at 8.  A search of a person—unlike his

threshold matter, the Court notes that it is unclear whether the existence of probable cause can justify handcuffing and patting down Defendant when the officers expressly disclaimed that they were effecting an arrest. *See Knowles v. Iowa*, 525 U.S. 113, 114, 119 (1998) (holding that the existence of probable cause to arrest the suspect did not render the officer's warrantless search of his car lawful when the officer did not intend to effect an arrest); *see also United States v. Lewis*, 147 A.3d 236, 252–53 (D.C. 2016) (Beckwith, J., dissenting) (same). The Court need not reach that issue, however, because the Court concludes that the officers did not have probable cause to arrest Defendant at the time he was handcuffed.

Probable cause to arrest exists only "if a reasonable and prudent officer would conclude from the totality of the circumstances that a crime has been or is being committed." *United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993) (citation omitted). The Court must consider "the facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Although "probable cause is a fluid concept" that is "not readily, or even usefully reduced to a neat set of legal rules," *Illinois v. Gates*, 462 U.S. 213, 232 (1983), the Supreme Court has cautioned that "a . . . seizure of a person" must be supported by evidence "particularized with respect to that person," *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

Probable cause to arrest and probable cause to search, moreover, are distinct inquiries, and, the existence of one does not necessarily give rise to the other. *See United States v. Gilliam*,

---

effects—however, is generally impermissible prior to his formal arrest. *See Search & Seizure* § 5.4 (b) ("[S]earch-before-arrest cases generally assume that a 'substantially contemporaneous' arrest is essential, and thus cannot readily be extended to encompass [a] situation in which no such arrest occurs." (citing *Cupp v. Murphy*, 412 U.S. 291, 296 (1973) (upholding the limited search of the suspect prior to his arrest where there was (1) probable cause to arrest, but no formal arrest; (2) the suspect was reasonably believed to be in the process of destroying evidence; and (3) the evidence could be preserved by a limited search)).

167 F.3d 628, 633 (D.C. Cir. 1999). Although both standards involve "the same *quantum* of evidence," "[e]ach requires a showing of probabilities as to somewhat different facts and circumstances." *Search & Seizure* § 3.1(b) (emphasis added). Unlike probable cause to arrest, probable cause to search requires only a "fair probability that contraband or evidence of a crime *will be found in a particular place*." *Gilliam*, 167 F.3d at 633 (emphasis added) (quoting *Gates*, 462 U.S. at 238). As such, "there can be probable cause to search a vehicle," for example, "without there also being probable cause to arrest the owner or operator of that vehicle." *Search & Seizure* § 3.1(b); *accord Butler v. United States*, 102 A.3d 736, 741 (D.C. 2014) ("[T]he legality of the search [incident to arrest] in this case cannot simply turn on whether the officer identified the smell of marijuana 'generally' emanating from appellant's vehicle—which indisputably would allow the police to search the *vehicle* for contraband—but rather on whether the facts and circumstances . . . gave [the officer] 'reasonable grounds to believe . . . that a felony ha[d] been committed by the person to be arrested.'" (citations omitted)).

According to the government, Officers Akhtar and Smith had probable cause to arrest Defendant for four reasons: (1) the car windows were heavily tinted; (2) the officers smelled PCP emanating either from the car or from Defendant, (3) the officers observed a glass vial inside the car; and (4) the events occurred in a high-crime neighborhood. Dkt. 10 at 7–8. The government further contends that, under the relevant case law, "a distinctive odor" of PCP can even, "by itself . . . provide sufficient probable cause to arrest or to search." Dkt. 18 at 21. The Court is, again, unpersuaded.

As a threshold matter, the government conflates the requirements for probable cause to arrest Defendant and probable cause to search the car. The Court agrees that a distinctive odor of PCP, alone, can establish probable cause to search the place from which the smell is emanating.

*See, e.g.*, *United States v. Glover*, 681 F.3d 411, 418–19 (D.C. Cir. 2012) (holding that the smell of PCP emanating from a home is sufficient for probable cause to obtain a search warrant); *United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2000) ("An officer's detection of the smell of drugs . . . can be an independently sufficient basis for probable cause [to search]." (citations omitted)); *Minnick v. United States*, 607 A.2d 519, 525 (D.C. 1992) ("[A] police officer who smells the identifiable aroma of a contraband drug emanating from a car has probable cause to believe that the car contains a quantity of that drug."). But, as explained above, probable cause to arrest an individual requires more than "a fair probability that contraband . . . will be found" in his vicinity. *Gilliam*, 167 F.3d at 633. An officer must, instead, be able to articulate a particularized basis for believing *that individual* has committed a felony. *See Butler*, 102 A.3d at 741. As far as the Court can discern, no published decision holds that the smell of a drug in a public space, alone, gives rise to probable cause to arrest a person in close proximity to the odor.[5]

---

[5] The Supreme Court did hold in *Maryland v. Pringle*, 540 U.S. 366, 372 (2003), that the police had probable cause to arrest all three occupants of a car that contained cocaine. Although the Court observed that "it was an entirely reasonable inference . . . that *any* or all three occupants had knowledge of, and exercised dominion and control over, the cocaine," *id*. at 372 (emphasis added), the Court went on to explain that the finding of probable cause was premised on the following facts: (1) the three individuals "were in a relatively small automobile," (2) "a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or evidence of their wrongdoing," and (3) a reasonable officer could "infer a common enterprise" based on "[t]he quantity of drugs and cash in the car," which were consistent with "drug dealing" and which the perpetrator "would [have] be[en] unlikely to" disclose "to an innocent person with the potential to furnish evidence against him." *Id.* at 373 (internal quotation marks and citation omitted).

The Court's analysis in *Pringle* does not extend to this case for several reasons. Most notably, the smell of PCP near a vehicle in which one adult is seated and two other adults are standing outside does not give rise to a reasonable inference that all three—or that any two—are engaged in a common criminal enterprise. Indeed, it is far from clear that there would have been probable cause to arrest Defendant and the passenger even if Defendant had been seated inside the car. The Court has located only one decision that even arguably supports such an inference, and the

Although the D.C. Circuit has yet to address this issue, substantial precedent establishes that more than the odor of a drug in a suspect's immediate vicinity is required to establish probable cause to arrest. The D.C. Court of Appeals recognized as much in *United States v. Butler*—a case on which the government itself relies. 102 A.3d at 741. There, the court noted that, to establish probable cause to arrest based on smell, "the officer [must] be able to link the unmistakable odor of [the drug] . . . to [the] specific person" and, "[t]he linkage must be reasonable and capable of articulation." *Id.* (first alteration in original) (citation omitted). Although the odor of marijuana in *Butler* was "generally emanating from [the appellant's] vehicle," *id.*, the D.C. Court of Appeals relied on two additional factors to establish the "particularized justification" necessary to find that the officer had probable cause to arrest the defendant: *First*, the appellant was "the sole occupant of the vehicle thus making it more likely that any marijuana present was either on his person or within his exclusive control." *Id. Second*, the officer testified that "the aroma was of fresh marijuana," rendering it "more likely that appellant was presently in possession of marijuana." *Id.*

Other courts have also held that the smell of a drug can give rise to probable cause to arrest but only if the odor can be connected to a specific person. *See, e.g.*, *United States v. Paige*, 870 F.3d 693, 700 (7th Cir. 2017) ("[T]he odor of marijuana, if sufficiently localized to a specific person, provides probable cause to arrest that person for the crime of marijuana possession."); *United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010) ("[The officer] had probable cause to arrest [the defendant] for marijuana possession once he detected the odor of marijuana emanating from [him]."); *United States v. Humphries*, 372 F.3d 653, 659 (4th Cir.

---

relevant discussion in that case is both dicta and is supported only by citations to cases finding probable cause to conduct a search. *See United States v. McGehee*, 672 F.3d 860, 868–69 (10th Cir. 2012).

2004) ("[I]f an officer smells the odor of marijuana in circumstances where the officer can localize its source to a person, the officer has probable cause to believe that the person has committed or is committing the crime of possession of marijuana."); *United States v Jackson*, 682 F. App'x 86, 87 (3d Cir. 2017) ("So long as an officer smells the odor of marijuana and can localize its source with sufficient particularity, probable cause has been established.").

That is not the case here. Although their testimony varied over time, both Officer Akhtar and Officer Smith ultimately acknowledged that they could not tell whether the smell of PCP emanated from Defendant or from the car. *See*, *e.g.*, Dkt. 16 at 33 (Hrg. Tr.). That is not enough because, unlike in *Butler*, Defendant was not alone and, in fact, was not even in the car. The officers, moreover, could not articulate a "particularized" basis for reasonably believing that Defendant—as opposed to someone else—had committed a crime. *See Ybarra*, 444 U.S. at 91. Officer Akhtar acknowledged that he had no specific reason to believe that Defendant was the owner of the car and, when asked whether had had reason to think that Defendant was the driver, Officer Akhtar simply replied, "I am not sure about that one." Dkt. 16 at 49–50 (Hrg. Tr.). He further acknowledged that the smell of PCP can last a "long time." *Id.* at 10 (Hrg. Tr.). Officer Smith did observe that the odor was stronger on the driver's side of the vehicle and "more faint on [the passenger side]," *id.* at 166 (Hrg. Tr.), but that, alone, is insufficient to establish probable cause that Defendant had committed a crime.

The government's argument, though, does not rest on the odor alone; the government also stresses that Officer Akhtar saw a vial of PCP near the interior handle on the driver's-side door. Had either officer observed such a vial (or what he reasonably believed to be the vial) before he handcuffed Defendant, that—along with the other evidence—might have been

sufficient to establish probable cause to arrest Defendant.[6]  Given Defendant's proximity to the

alleged vial and the fact that it was in plain view, one might reasonably infer that the vial

belonged to Defendant because someone engaged in the distribution of PCP would not leave his

product (or evidence of his unlawful activity) so easily accessible to third parties.  *Cf. Pringle*,

540 U.S. at 373–74.  The government's argument, however, suffers from two substantial

problems.  *First*, and foremost, neither officer could testify that he saw the vial *before* placing

Defendant in handcuffs.  *Second*, as explained above, the government has not carried its burden

of establishing that the officers saw a vial—or what they believed to be a vial—inside the

driver's-side door of the vehicle.

The Court is therefore left with the following facts.  The officers encountered Defendant

in a high-crime neighborhood next to a car with tinted windows, and they smelled PCP near him.

Other evidence, however, showed that the officers encountered Defendant in broad daylight; they

did not observe him reaching into the car or engaging in any sort of transaction; Officer Smith

was aware of at least one young child in the back seat; and Defendant responded calmly and

cogently to Officer Akhtar's questions.  There was no meaningful evidence, moreover, that

Defendant was high on PCP; he did not exhibit any symptoms of having ingested PCP and, as

explained above, the Court is unpersuaded that the officers saw any associated paraphernalia.

Finally, Officer Smith testified that it was not uncommon to smell PCP—an odor that is powerful

enough to fill an entire courtroom—in the general area.  Dkt. 16 at 11, 92 (Hrg. Tr.).  The Court

finds, in light of the totality of these circumstances, that Defendant's mere proximity to a car

---

[6]  The dispositive issue here is not whether a vial in fact existed, but whether the officers
reasonably believed that they saw it before handcuffing Defendant.  *See United States v.
Williams*, 878 F. Supp. 2d 190, 200–01 (D.D.C. 2012) ("If an officer is mistaken as to a fact, but
his mistake was objectively reasonable, courts have generally concluded that the stop itself is
reasonable." (citations omitted)).

with tinted windows and the strong odor of PCP, without more, does not establish probable cause to arrest him for a drug offense.

The Court, accordingly, holds that the officers' use of handcuffs was unreasonable.

## C. Pat-Down

The only remaining issue is whether the pat-down was lawful. If not, the fruits of the pat-down must be suppressed.

There is no dispute that, absent Defendant's consent, Officer Smith did not have sufficient cause to frisk him. The Supreme Court's command is clear: an officer "may conduct a limited protective search for concealed weapons" only when he is "justified in believing that the individual . . . is armed and presently dangerous to the officer or to others." *Adams v. Williams*, 407 U.S. 143, 146 (1972) (quoting *Terry*, 392 U.S. at 24). Here, neither officer testified that, at the time of the pat-down, there was reason to suspect that Defendant was armed; to the contrary, Officer Akhtar testified on multiple occasions that he had no basis to believe that Defendant carried a concealed weapon. *See* Joint Ex. 1 at 18; Dkt. 16 at 45 (Hrg. Tr.). Defendant did, however, consent to the pat-down. The Court must, accordingly, determine whether that consent was valid and, if so, whether the pat-down was nonetheless unduly intrusive.

### 1. *Consent*

Even if Defendant was unlawfully seized, suppression of the physical evidence recovered from his person is not required if he validly consented to the pat-down. *See United States v. Holmes*, 505 F.3d 1288, 1294 (D.C. Cir. 2007). In *United States v. Holmes*, the D.C. Circuit recognized that "[e]vidence obtained following an unlawful seizure may be admissible if the government can demonstrate that there was an act prior to discovery of the challenged evidence sufficient to 'purge the primary taint' and break the causal chain between the illegal government

conduct and the evidence's ultimate discovery." *Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 602 (1975)). Although *Holmes* dealt with consent that was given following an illegal search, not seizure, the Court of Appeals concluded that the standard for assessing the voluntariness of a suspect's consent following an unlawful search and unlawful seizure is the same. *Id.*

In *Holmes*, the police apprehended the defendant mid-flight, handcuffed him, and confiscated his car keys. *Id.* at 1290. "The officers then asked [the defendant], still handcuffed, if he would sign a consent-to-search form to allow the officers to search his car," which he did. *Id.* at 1291. Based on those facts, the D.C. Circuit concluded that the above standard was not satisfied and reversed the district court's denial of a motion to suppress. As the court explained, it is not enough for the government to show that the defendant's consent was voluntary; to "break the causal chain," the government must demonstrate that the defendant's consent was "'sufficiently an act of free will' [such] that it was not a result of the exploitation of the unlawful seizure." *Id.* at 1294 (quoting *Brown v. Illinois*, 422 U.S. at 602–04).

To make that assessment, the *Holmes* court looked to the four-factor test set forth in *Brown v. Illinois*: (1) whether *Miranda* were warnings given; (2) the temporal proximity of the arrest and the consent; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *See id.* Applying those factors, the D.C. Circuit held that the defendant's consent was invalid because "there was virtually no temporal gap between the seizure and the consent;" "[t]he entire incident occurred in the middle of the night on an empty street;" and there were no "intervening circumstances" to "break the causal chain between the illegal government conduct and the evidence's ultimate discovery." *Id.* at 1294. Although the police did not engage in any flagrant acts of misconduct, the Court concluded that "the absence

of th[at] factor" did not "compensate[] for the strongly coercive circumstances otherwise surrounding [the defendant's] grant of consent to search." *Id.* at 1295.

With one exception, the same "strongly coercive circumstances" exist in this case. Although Defendant assented to Officer Smith's pat-down, he, like the defendant in *Holmes*, was in handcuffs at the time. *See* Gov't Ex. 2 (CS 21:27:28–30). Moreover, less than two minutes had elapsed between the time the officers unlawfully seized him and when Officer Smith solicited his consent for a pat-down. *See id.* (CS 21:26:20–21:27:30). That "temporal proximity" weighs "heavily against a finding" that Defendant's consent "was an act of free will sufficient to purge the taint" of his unlawful seizure. *Holmes*, 505 F.3d at 1295. And, the footage from both officers' body-worn camera reflects that no intervening circumstances occurred during that time that might have broken the "causal chain" between Defendant's illegal seizure and his consent to the search. To the contrary, Defendant was detained and handcuffed during that entire period. The only material difference between *Holmes* and this case is that the events at issue here did not occur in the middle of the night on an empty street. The *Holmes* court, however, considered that factor in the context of assessing whether any "intervening circumstances" purged the taint resulting from the unlawful search, and it concluded that the defendant still "faced a coercive situation at the time he gave his consent." *Id.* The same conclusion applies here.

The Court, accordingly, finds that Defendant's consent was invalid and that, as result, the physical evidence recovered from the search incident to his formal arrest must be suppressed as fruit-of-the-poisonous tree. *See Wong Sun*, 371 U.S. at 484.

2.    *Scope*

Given the Court's holding, it need not reach the question of whether the scope of the pat-down violated the Fourth Amendment.  The Court will note, however, that it is unpersuaded by Defendant's characterization of the pat-down as an "extraordinarily invasive and intimate search—involving the penetration of one of [Defendant's] body cavities."  Dkt. 13 at 10.  To be sure, Officer Smith did briefly "squeez[e] and prod[]" Defendant's inner-thigh area over his trousers, *id.*, but the search did not "involve the penetration or prodding of body cavities," *id.* The pat-down was similar in kind to the one upheld by the D.C. Circuit in *United States v. Rodney*, 956 F.2d 295 (D.C. Cir. 1992), in which the Court of Appeals concluded that "a continuous sweeping motion over [the defendant's] outer garments, including the trousers covering his crotch area," was "not unusually intrusive," *id.* at 298.

## CONCLUSION

The Court's recognizes that its analysis must, of course, be informed by the experience and reasonable perceptions of police officers who regularly face circumstances that are potentially dangerous, fluid, and uncertain.  That, however, does not alter the government's burden of proving that "the measures employed during the stop were [reasonably] justified." *Mangum*, 100 F.3d at 169.  The Court's holding is narrow: the government has failed to show— on the specific facts of this case—that the officers acted reasonably when they decided to handcuff Defendant based solely on the smell of PCP emanating from his vicinity, a mere thirty seconds after the officers left their patrol car and within ten seconds of Officer Akhtar coming within arm's-length of Defendant.  Absent any particularized evidence that Defendant himself was under the influence of PCP or that he was dangerous in any way, there is no basis for the Court to find that Defendant posed "an immediate threat to the safety of the officers or others,"

*Dykes*, 406 F.3d at 720. Nor has the government identified evidence that would have allowed a reasonable officer to conclude that he had probable cause to arrest Defendant. The Court, accordingly, holds that the officers' use of handcuffs in this case transformed the otherwise valid *Terry* stop into an arrest without probable cause. The physical evidence recovered from Defendant's person is the fruit of that unlawful seizure and must be suppressed.

The Court therefore **GRANTS** Defendant's motion to suppress. Dkt. 8.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: January 30, 2019